Matter of Cutie v Walsh (2024 NY Slip Op 50157(U))

[*1]

Matter of Cutie v Walsh

2024 NY Slip Op 50157(U)

Decided on February 14, 2024

Supreme Court, Washington County

Muller, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on February 14, 2024
Supreme Court, Washington County

In the Matter of the Application of Daniel J. Cutie, Petitioner,

against
Frank T. Walsh, Jr., as Acting Inspector General 
 of the Office of the Medicaid Inspector General, Respondent.

Index No. EC2023-35149

Jacobson Goldberg & Kulb, LLP, Garden City (Jeffrey A. Granat of counsel), for petitioner. 
Letitia James, Attorney General, Albany (Amanda Kuryluk of counsel), for respondent.

Robert J. Muller, J.

The New York State Department of Education (hereinafter DOE) oversees the licensing of pharmacists (see Education Law art 137). In this regard, the DOE is responsible for investigating any alleged misconduct within the pharmacy profession and assessing appropriate penalties (see Education Law art 130; 8 NYCRR 29.7).
The New York State Department of Health (hereinafter the DOH), on the other hand, oversees the administration and supervision of the Medicaid program (see Social Services Law § 363-a). In 2006, the Office of the Medicaid Inspector General (hereinafter OMIG) was established as an independent office within the DOH to "reorganize and streamline the state's process of detecting and combating Medicaid fraud and abuse and maximize the recoupment of improper Medicaid payments" (Public Health Law § 30). OMIG is responsible for administrative enforcement actions against any individual or entity that is suspected of engaging in fraud, waste, abuse, or other unacceptable practices in the Medicaid program (see Public Health Law § 31). In this regard, OMIG may sanction an individual or entity with exclusion from the program — where deemed appropriate — and determines any subsequent requests for reinstatement (see Public Health Law § 32 [6]; 18 NYCRR part 515). 
Petitioner became a licensed pharmacist in 1989 and thereafter spent several years in [*2]retail pharmacy. In 2002, he opened Cutie Pharma-Care, Inc., a long-term care pharmacy in the Town of Greenwich, Washington County.[FN1]
 At all relevant times, petitioner was the supervising pharmacist of Cutie Pharma-Care.
In or around 2009, the DOE charged Cutie Pharma-Care with the following specification of professional misconduct:
"A. [O]n or about June 14, 2006, [Cutie Pharma-Care] committed unprofessional conduct by its agents and employees, as set forth below:
1. The pharmacy held for sale misbranded drugs[;]
2. Pharmacists received returned drugs from the facility accounts (such as adult homes) and . . . maintained the balance of the prescriptions among the pharmacy stock[;]
3. The pharmacy maintained outdated and/or misbranded drugs in stock[;]
4. The pharmacy maintained adulterated drugs[;]
5. Pharmacists dispensed prescriptions for controlled substances in excess of legal quantities[;]
6. Pharmacists dispensed oral prescriptions for controlled substances that lacked required information documents on the oral prescriptions and/or lacked the required hard cover prescription attached to the oral prescription or order[; and]
7. Pharmacists dispensed drugs without valid prescriptions . . . .
"B. [O]n or about September 20, 2007, [Cutie Pharma-Care] committed unprofessional conduct by its agents and employees in that[ t]he pharmacy held for sale misbranded drugs . . . " [NYSCEF document No. 25, at pp 42-44].
On May 28, 2009, petitioner signed a Consent Order with the DOE on behalf of Cutie Pharma-Care admitting guilt to charges A (2), (6) and (7) in full satisfaction of the specification. He agreed to a penalty of censure and reprimand, together with a 2-year period of probation and a fine of $10,000.00. As a result of this Consent Order, petitioner was also censured by OMIG, effective April 29, 2010 (see 18 NYCRR 515.3 [a] [2]).
In or around 2019, the DOE charged petitioner with a second specification of professional misconduct:
"[Petitioner], on or about and between August 28, 2018 and November 13, 2018, while employed and practicing as a supervising pharmacist at and part-owner of Cutie Pharma-Care . . . committed the following:
"1. [I]n his capacity as supervising pharmacist, [petitioner] permitted expired controlled substances to be stored within the narcotics inventory cabinet[;]
"2. [I]n his capacity as supervising pharmacist, [petitioner] permitted outdated, misbranded, and/or adulterated drugs to be maintained in stock[;]
"3. [I]n his capacity as supervising pharmacist, [petitioner] permitted his employees to remove returned medications from the 'medicine in time' blister packaging and return said product to stock bottles for future use[;]
"4. [I]n his capacity as supervising pharmacist, [petitioner] permitted his employees to remove co-mingled medications from the returned 'medicine in time' blister packaging and return said product to stock bottles for future use[;]
"5. [I]n his capacity as supervising pharmacist, [petitioner] permitted the failure to affix lot number(s) on the 'medicine in time' blister packs[;]
"6. [I]n his capacity as supervising pharmacist, [petitioner] permitted the co-mingling [of] medication of different strength dosages in the same stock bottles[;]
"7. [I]n his capacity as supervising pharmacist, [petitioner] permitted the co-mingling of medication of different types in the same stock bottle[;]
"8. [I]n his capacity as supervising pharmacist, [petitioner] permitted the employees under his supervision to fill stock bottles with more pills than labeled on the stock bottle;
"9. [Petitioner] accepted deliveries of medications at an unsecured porch of his private residence and/or directed and/or permitted an unlicensed employee . . . to accept medication deliveries at her private residence;
"10. [I]n his capacity as supervising pharmacist, [petitioner] on or about August 28, 2018, permitted the pharmacy to operate at greater than a two to one (2:1) ratio of unlicensed persons to assist the licensed pharmacists[;]
"11. [Petitioner,] or a licensed pharmacist under his supervision, dispensed or permitted the dispensing of a 'medicine in time' blister package of co-mingled medication that was prepared for patient 'G.W.,' a 93 year old patient . . . , which contained multiple 2.5 mg doses of methotrexate, a cancer and rheumatoid arthritis medication when the patient was actually prescribed and should have been dispensed 2.5 mg of metolazone, a diuretic medication[;]
"12. [Petitioner,] or a licensed pharmacist under his supervision, failed or permitted the failure to sign the aforesaid 'medicine in time' blister package dispensed for patient 'G.W.'[; and]
"13. [Petitioner,] in his capacity as a supervising pharmacist, permitted the storing of medications/drugs in an unregistered and/or unsecured area/room adjacent to the registered pharmacy" [NYSCEF document No. 2, at pp 9-11].
On July 12, 2019, petitioner signed a Consent Order with the DOE whereby he did "not contest the . . . specification of professional misconduct" [NYSCEF document No. 2, at p 5], and agreed to a penalty of license suspension for 2 years, with the last 15 months of the suspension stayed. He further agreed to a 2-year period of probation upon his return to the practice of pharmacy, as well as the payment of a $1,000.00 fine. As a result of this second Consent Order, OMIG excluded petitioner from participating in the Medicaid program, placing him on the Medicaid Exclusion List (hereinafter MEL) effective June 2, 2020 (see 18 NYCRR 515.3 [a] [1]).
While petitioner's license suspension ended on November 25, 2020, he remains on the MEL. In this regard, 18 NYCRR 515.5 provides, in pertinent part:
"(a) No payments will be made to or on behalf of any person for the medical care, services or supplies furnished by or under the supervision of the person during a period of exclusion . . . .
"(c) A person who is excluded from the program cannot be involved in any activity relating to furnishing medical care, services or supplies to recipients of medical assistance for which claims are submitted to the program, or relating to claiming or receiving payment for medical care, services or supplies during the period.
"(d) Providers reimbursed on a cost-related basis may not claim as allowable costs any [*3]amounts paid . . . to any person who is excluded from the program . . . .
"(e) Providers reimbursed on a fee-for-services basis may not submit any claim and cannot be reimbursed for any medical care, services or supplies furnished by any person who is excluded from the program . . . ."
18 NYCRR 515.2 (b) (7) further provides that the "[e]mployment of sanctioned persons" is an unacceptable practice that could result in sanctions for the employer. With virtually every pharmacy — regardless of location or the population it serves — participating in the Medicaid program, a pharmacist excluded from the program is virtually unemployable. There does not appear to be any dispute in this regard.
On June 13, 2022, petitioner applied to respondent for removal from the MEL. To the extent that G.W. died after receiving the erroneous medication, petitioner submitted a letter in support of the application acknowledging the seriousness of his error and "tak[ing] full responsibility for the event" [NYSCEF document No. 3, at p 2]. Petitioner further stated as follows:
"As a result of this I have taken special care to do several continuing education courses including in the area of medication errors. When I discovered the mistake, I immediately contacted the prescriber without any concern for my own license; I was concerned about the welfare of that patient and all of the patients we . . . served over the [16] years of our operation.[FN2] I am extremely burdened by the event of a mistake happening under my supervision. And I am heart fully (sic) sorry for this error. Additionally, I have enrolled in the nonprofit organization known as the Institute for Safe Medication Practices to keep abreast of trends of dispensing errors and how to prevent such.
"I live a modest life with my family. I am not an extravagant individual. While I remain on the [MEL], I had to find work. I did find work at the Nové Restaurant . . . as a line chef in order to provide for our family [sic] day to day living expenses. I hope, that in review of my request . . . you will find in favor of me being removed from the [MEL]" [NYSCEF document No. 3, at p 2]. Petitioner also submitted letters from 8 other individuals in support of his application, namely James R. Schiffer, R.Ph., Esq., his attorney relative to the application; Joseph J. Bova, Director of Continuing Professional Education at Arnold & Marie Schwartz College of Pharmacy and Health Sciences, who confirmed petitioner's continuing education credits; Marina Plotkin, R.Ph., Esq., who represented him in a civil action brought by the estate of G.W.; and personal references Danielle Stroupe, M.Ed., Valerie A. Capone R.N., Karl G. Williams, R.Ph., Esq., Rev. Martin J. Fisher, and Karen Sideri. Each of these individuals opined that, if removed from the MEL, petitioner would not repeat his previous infractions and would be an asset to the practice of pharmacy. 
Upon receipt of the application, it was assigned to Wendy Siek, employed by OMIG as a Medicaid Integrity Specialist 1. She "reviewed the request and the records applicable and determined that removal of [petitioner] from the [MEL] was not in the best interest of the Medicaid program" [NYSCEF document No. 31, at ¶ 3]. The notes from this review state as [*4]follows:
"Basis for Recommendation: [Petitioner] states he has spent much personal time and soul searching over the past three plus years considering the serious incident and related issues that led to his exclusion. He believes he is prepared to reenter as a practicing pharmacist. He has taken several steps such as continuing ed classes and other classes dealing with error prevention and proper handling of prescription drugs. [Petitioner] has been a licensed pharmacist since 1989. As this was the 2nd occurrence of this behavior and speaks to [petitioner's] ethics, poor judgment and inability to follow the rules that govern his profession, his repeated behavior is very concerning. Given that less than 2 years have passed since [OMIG] felt his behavior posed a potential threat to [Medicaid] recipients, I would not recommend removal from the [MEL] at this time. OMIG conducted [an investigation] in 2018 based on a call from [the DOE that it] received a complaint that [petitioner was] re-dispensing blister packs returned from affiliated nursing homes. Medicaid may be double billed for these drugs. . . " [NYSCEF document No. 29, at p 2].
Siek gave her review and recommendation to Ryan Kircher, employed by OMIG as a Medicaid Integrity Specialist 2, who "review[ed] her work and [conducted] a review of [his own to determine if [he] agreed with her recommendation" [NYSCEF document No. 31, at ¶ 3]. Kircher ultimately determined that he did agree and communicated the denial to petitioner by letter dated September 8, 2022. This letter stated, in pertinent part:
"The basis for this denial is related to the laws, rules, and/or regulations referenced below:
"[18 NYCRR §] 504.5 (a) (11) a prior finding by a licensing, certifying or professional standards board or agency of the violation of the standards or conditions relating to licensure or certification or as to the quality of services provided.
"[18 NYCRR §] 504.5 (a) (2) any previous or current suspension, exclusion or involuntary withdrawal from participation in the Medicaid program or from participation in any other governmental or private medical insurance program including, but not limited to, Medicare.
"[18 NYCRR §] 504.5 (a) (13) any other factor having a direct bearing on the applicant's ability to provide high quality medical care, services or supplies to recipients of medical assistance benefits, or to be fiscally responsible to the program.
"[18 NYCRR §] 504.5 (a) (14) any other factor which may affect the effective and efficient administration of the program, including, but not limited to, the current availability of medical care, services or supplies to recipients" [NYSCEF document No. 5, at p 1].
Kircher enumerated those items of evidence relied upon relative to each rule. Specifically, with respect to 18 NYCRR § 504.5 (a) (11), Kircher referenced the Consent Orders signed by petitioner in May 2009 and July 2019, respectively. With respect to 18 NYCRR § 504.5 (a) (2), Kircher referenced petitioner's censure as a result of the May 2009 Consent Order and his subsequent suspension as a result of the July 2019 Consent Order. With respect to 18 NYCRR § 504.5 (a) (13), Kircher referenced the fact that petitioner failed to rectify his behavior after being censured in 2009, instead continuing to engage in the same professional misconduct. [*5]Specifically, Kircher stated as follows:
"The nature of your behavior, and the fact that you committed many of the same specifications of professional misconduct after the first Consent Order . . . has a direct bearing on your ability to provide high-quality medical care, services or supplies to recipients of medical assistance benefits should you be removed from the Medicaid Exclusion List" [NYSCEF document No. 5, at p 2].
Finally, with respect to 18 NYCRR § 504.5 (a) (14), Kircher stated:
"While . . . you have taken many continuing education classes on ethics, and provided letters of support, the fact remains that due to your repeated behavior [respondent] cannot be certain this conduct will not be repeated. Your actions as supervising pharmacist and owner of a pharmacy which led to the Consent Orders . . . , along with the subsequent censure and exclusion from the Medicaid [p]rogram, have a direct impact on the effective and efficient administration of the Medicaid program should you be removed from the Medicaid Exclusion List" [NYSCEF document No. 5, at p 2].
Petitioner appealed the denial of his application on October 31, 2022 and, on December 13, 2022, this appeal was denied. Petitioner thereafter commenced this CPLR article 78 proceeding on April 10, 2023, contending that respondent's determination must be vacated. 
"In reviewing a determination such as that made by [respondent] here, judicial inquiry is limited to whether the determination was arbitrary and capricious, or without a rational basis in the record and a reasonable basis in law" (Matter of Singer v Rosen, 189 AD3d 1423, 1425 [2d Dept 2020]; see Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 NY2d 222, 231 [1974]; Matter of Adirondack Wild: Friends of the Forest Preserve v New York State Adirondack Park Agency, 161 AD3d 169, 176 [3d Dept 2018], affd 34 NY2d 184 [2019]; Matter of Fuller v New York State Dept. of Health, 127 AD3d 1447, 1448 [3d Dept 2015]; Matter of Andries v Cox, 117 AD3d 731, 732 [2d Dept 2014]). 
That being said, the framework for determining an application for removal from the MEL and reinstatement in the Medicaid program is governed by 18 NYCRR § 515.10, which provides as follows:
"(a) A person sanctioned under [18 NYCRR part 515] may request reinstatement . . . at any time after the date or time period specified in the notice of agency action, or upon the occurrence of an event specified in the notice.
"(b) A request for reinstatement or for removal of any condition or limitation on participation in the program is made as an application for enrollment under [18 NYCRR part 504] and must be denominated as a request for reinstatement to distinguish it from an original application.
"(c) The request for reinstatement must be sent to the provider enrollment unit of the department.
"(d) The request must:
"(1) include a complete ownership and control disclosure statement;
"(2) state whether the party has been convicted of other offenses related to participation in the Medicare, Medicaid or social services programs which were not considered during [*6]the development of the sanction; and
"(3) state whether any State or local licensing authorities have taken any adverse action against the party for offenses related to participation in the Medicare, Medicaid or social services programs which were not considered during the development of the sanction.
"(e) The department may grant reinstatement only if it is reasonably certain that the violation(s) that led to sanction will not be repeated."
Here, petitioner contends that OMIG must grant his request for reinstatement to the Medicaid program under 18 NYCRR § 515.10 because he has demonstrated — with reasonable certainty — that the violations which led to his exclusion will not be repeated. This contention is without merit. Respondent's determination that petitioner failed to make the requisite showing under 18 NYCRR § 515.10 has both a rational basis in the record and a reasonable basis in the law. Kircher provided not only a detailed recitation of the factors considered under 18 NYCRR § 504.5, but also the evidence considered relative to each factor — and there is ample evidence. 
Indeed, notwithstanding his censure, petitioner continued the violations enumerated in the May 2009 Consent Order. He continued placing drugs returned from nursing facilities back on the shelves in violation of 8 NYCRR §§ 29.7 (14) and (15), which conduct potentially resulted in Medicaid getting billed twice. He continued failing to provide the requisite oversight when dispensing medications — which failure ultimately led to grave consequences.
In this regard, it is noted that the letter submitted by Plotkin in support of petitioner's application sought to minimize the gravity of his actions with respect to G.W.:
"Thanks to [petitioner's] swift action, the etiology of [G.W.'s] symptoms was identified and treatment options made available, including methotrexate antidote, leucovorin. Defense expert, Board certified medical oncologist and medical examiner Dr. Robert Sklaroff opined that the methotrexate dose was low, did not cause organ failure, was reversible and, in fact, was resolving when the family opted for comfort care. He noted 'there is no doubt there was methotrexate-toxicity, but there is also no doubt that the patient's projected longevity matches his age and myriad disabilities . . . . He did not seem to have ongoing toxicity when he decided to die" [NYSCEF document No. 27, at p 52].
These statements by Plotkin appear numerous times in the record, with petitioner ostensibly suggesting that his conduct is somehow less egregious because he alerted G.W.'s treating physician to the mistake — as he was professionally obligated to do — and the mistake did not immediately cause G.W.'s death. G.W. just "decided to die" [NYSCEF document No. 27, at p 52]. The Court views such characterization of G.W.s state of mind as rather callous and divergent with petitioner's statements that he is "extremely burdened by the . . . mistake" and "heart fully (sic) sorry for [the] error" [NYSCEF document No. 3, at p 2]. It is also noteworthy that petitioner submitted several letters in support of the application. Two were from attorneys he retained, and another was from an expert he retained. 
Petitioner further contends that he is only seeking to return to the practice of pharmacy as a staff pharmacist — not as a supervising pharmacist — and OMIG failed to appreciate the distinction when denying his application. According to petitioner, both the May 2009 and July 2019 Consent Orders arose from mistakes he made as a supervising pharmacist — mistakes he could not make as a staff pharmacist. Petitioner also notes that he will be under probation for two years once he resumes his practice as a pharmacist, with additional oversight from the DOE. [*7]While these points are well taken, it is unclear whether OMIG has the authority to grant the application with such a condition. It is likewise unclear how OMIG could ever police the imposition of such a condition — certainly there would be no OMIG or DOE representatives present on a daily basis to observe petitioner in the pharmacy. In this regard, the only oversight included in the terms of probation annexed to the July 2019 Consent Order is the submission of a continuing education plan and proof of payment of registration fees.
In sum, petitioner is correct that the DOE will now permit him to work as a licensed pharmacist, but he is precluded from doing so by OMIG. The DOE and OMIG, however, work within different statutory frameworks. Unlike the DOE, "OMIG has a responsibility to ensure that scarce Medicaid dollars are spent on quality medical care for Medicaid recipients, who are often unable to vote with their feet" (Matter of Koch v Sheehan, 21 NY3d 69, 700 [2013]; Matter of LeadingAge NY, Inc. v Shah, 32 NY3d 249 [2018]). Here, OMIG found that if petitioner was removed from the MEL at this time, "he could . . . end up . . . filling prescriptions for Medicaid recipients, which would be a risk to the integrity of the Medicaid program, given his history[, and t]herefore his remaining on the [MEL] protects medically vulnerable recipients as well as the general integrity of the Medicaid program" [NYSCEF document No. 31, at ¶ 8]. Under the circumstances, it cannot be said that this determination is arbitrary and capricious (see Matter of Singer v Rosen, 189 AD3d at 1425; Matter of Andries v Cox, 117 AD3d at 733).[FN3]

Having thus considered NYSCEF document Nos. 1 through 9, 13 through 15, 20 through 43 and oral argument having been heard on February 9, 2024 with Jeffrey A. Granat, Esq. appearing on behalf of petitioner and Amanda Kuryluk, Esq. appearing on behalf of respondent it is hereby 
ORDERED that the relief requested is denied and the petition is dismissed in its entirety.
The above constitutes the Decision and Order of this Court.
The original of this Decision and Order has been filed by the Court. Counsel for respondent is directed to serve petitioner with notice of entry. 
Dated: February 14, 2024
Lake George, New York
ROBERT J. MULLER, J.S.C.
ENTER:

Footnotes

Footnote 1:Long-term care pharmacies furnish drugs and supplies to nursing facilities.

Footnote 2:Cutie Pharma-Care closed following issuance of the second Consent Order.

Footnote 3:As set forth in OMIG's December 2022 denial of his appeal, petitioner is free to re-apply for removal from the MEL as of December 13, 2024.